[814 NYS2d 142]

In the Matter of LINDA B. JOHNSEN, as Executrix of PHILIP A. GARDA, Deceased, Respondent, v ACP DISTRIBUTION, INC., et al., Appellants.

First Department, April 27, 2006

APPEARANCES OF COUNSEL

*Levy & Schneps, P.C.*, Manhasset (*Michael A. Levy* and *Lewis R. Mandel* of counsel), for appellants.

*Lazer, Aptheker, Rosella & Yedid, P.C.*, Melville (*Zachary Murdock* of counsel), and *Pullman & Comley, LLC*, Bridgeport, Connecticut (*D. Robert Morris* of counsel), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

This appeal presents the issue of whether the commencement of an involuntary dissolution proceeding under Business Corporation Law § 1104 triggers the buy-sell provisions of a stockholders agreement that specifically provides that a stockholder may not donate, hypothecate, pledge, transfer or otherwise dispose of his or her stock "in any manner whatsoever" without first offering the same for sale to the corporation or the remaining stockholders.

ACP Distribution, Inc., a heating, ventilation and air-conditioning (HVAC) supply distributor, has an exclusive license arrangement with a cooperative organization that serves as a master distributor of HVAC supplies for manufacturers. By 1996, after the death of four of ACP's six shareholders, Andrew J. Garda (Andrew) and Philip A. Garda (Philip), brothers, were the only remaining holders of all of the company's outstanding shares of stock. To that point, each of the deceased shareholder's estates had been paid under an existing shareholders' agreement that provided for a purchase price equal to 100% of the deceased shareholder's equity as shown in ACP's financial statements.

Andrew and Philip each had three children. Philip's son, Philip A. Garda, Jr. (Philip Jr.), and Andrew's son, Andrew T. Garda (Drew), had become full-time employees of the business. Not wanting to exclude their other children from the financial benefits of the business, while at the same time preserving the ability of Philip Jr. and Drew to control the business without family interference, Andrew and Philip recapitalized ACP to provide for voting shares that would eventually be held by Philip Jr. and Drew, and nonvoting shares to be held by family

members who did not work in the business. As recapitalized, ACP was authorized to issue 616 shares of voting common stock and 616 shares of nonvoting common stock, divided equally between Andrew and Philip.

Recognizing that with fewer shareholders, ACP would find it increasingly difficult to redeem stock should either of them or members of their family to whom they might assign stock elect to sell, Andrew and Philip revised their buy-sell arrangement and, on October 1, 1996, entered into a new "stockholders agreement" that would insure ACP's continuance by avoiding a buyout demand that it could not afford. The brothers agreed upon a solution—to provide in a new agreement that any buyout be at a discounted value of 70% of book value payable over a 10-year period. By that time neither Andrew nor Philip was actively involved in the business, having retired. The relevant provision in the new agreement, paragraph 7 (a), denominated "Termination of Relationship," states as follows:

> "Except as otherwise expressly provided for herein, no Stockholder shall at any time during the term of this Agreement donate, hypothecate, pledge, transfer or otherwise dispose of his Stock in any manner whatsoever, without first offering the same for sale first to the Company, and if the Company does not wish to purchase same, then to the Remaining Stockholders in the manner hereinafter provided and at the sales price and on the terms hereinafter set forth."

The balance of paragraph 7 outlines the procedures to be followed in the event of a stockholder's offer of sale to a third party, thereby triggering the right of first refusal of the company and/or the other shareholders, and is not implicated in this dispute. Paragraph 10 establishes a formula for the calculation of the sales price at "book value . . . less a thirty (30%) percent discount from book value per share" in the case of an offer of sale by a shareholder to the company and/or other shareholders. Under paragraph 4 of the agreement, a shareholder, during his lifetime or by will, could transfer all or part of his stock to members of his immediate family (defined as spouse and children) without first offering the stock to the company and/or the other shareholders. The agreement also provided that any breach of the agreement would cause irreparable harm and that injunctive relief or specific performance was the remedy for such breach or threatened breach.

On or about November 1, 1996, approximately one month after execution of the new stockholders agreement, Andrew transferred his 308 shares of voting common stock and his 308 shares of nonvoting common stock to his wife, who died shortly thereafter on November 27, 1996. She bequeathed all of the 308 shares of voting common stock to Drew, who, as noted, was employed full time at ACP, and the 308 shares of nonvoting common stock, in equal shares, to her other two children, Joseph and Barbara, who were not employed in the business.

On or about August 22, 1997, ACP redeemed the 308 shares held by Joseph and Barbara at the price provided for in the stockholders agreement, namely, 70% of the book value of their shares.[1] After that transaction, the remaining shareholders were Philip, who continued to own 308 shares of voting common stock and 308 shares of nonvoting common stock, and Drew, who owned 308 shares of voting common stock, the same as his uncle Philip. Drew continued to run the business on a day-to-day basis with his cousin, Philip Jr., who died on June 12, 1999 before any of Philip's stock had passed to him. Drew continues to conduct the day-to-day business of ACP as its chief executive officer. At the time this proceeding was commenced—by Philip's daughter, Linda B. Johnsen, as his conservator—Philip was still the owner of all of his voting and nonvoting shares of stock.[2]

On August 20, 2003, counsel for Johnsen wrote to Drew confirming a prior conversation relating to Johnsen's desire to sell her father's share of the business and real estate for $2,000,000. The letter concluded with the threat that unless Drew agreed to the repurchase of Philip's stock at the price demanded, the only other options available to him were the sale of the business to a third party for the highest possible price or the defense of a dissolution proceeding. Ensuing negotiations proved unsuccessful, and on November 22, 2003 Johnsen herself wrote to Drew requesting a special meeting of the stockholders to elect three directors because "we are unable to reach an agreement concerning the redemption of my father's stock." Drew responded by letter of December 5, 2003, advising that ACP was being appraised "so that I will be in a position to

---

**1.** The record fails to reveal that either Philip or petitioner, on his behalf, ever registered any complaint that Philip's ownership of two thirds of ACP's remaining stock immediately benefitted by the 30% discount in price that Joseph and Barbara had to accept instead of full book value.

**2.** Philip died in January 2006, staying the proceedings herein, and Johnsen has been substituted as petitioner in her new capacity as executrix of Philip's estate.

consider making a sensible offer to acquire your family's interest." He characterized Johnsen's request for a shareholders' meeting as a legal strategy designed "to engineer a deadlock which can then be used to form the basis of a court proceeding seeking to dissolve the company." In urging that Johnsen reconsider such action, Drew pointed out the costs likely to be incurred in such a proceeding as well the prospect of a forced sale for less than market value.

Six months later, on June 19, 2004, Drew wrote to Johnsen, advising he was accepting her proposal that he purchase her father's shares of ACP, but "at the price contained in . . . the Stockholders' Agreement." In so doing, he referred to the buyout provisions of paragraph 7 (a), and noted that any buyout would be at a price equal to book value less 30%. Johnsen responded by commencing this proceeding against ACP, Andrew, Drew and Brian Garda under Business Corporation Law § 1104 (a) (2), alleging a division among the shareholders that rendered an election of directors unobtainable. Alternatively, Johnsen alleged, pursuant to section 1104 (c), that as a result of such division, the shareholders, for a period of at least two annual meeting dates, had been unable to elect successors to the directors whose terms have expired. These grounds appear to be undisputed. The only substantive relief sought by Johnsen was the dissolution of ACP. In their answer, respondents asserted a counterclaim seeking an order directing Johnsen to sell all of Philip's shares of stock in accordance with the terms of the stockholders agreement.

Respondents moved for summary judgment granting injunctive relief on their counterclaim directing Johnsen to sell Philip's shares of ACP's stock in accordance with the terms of the stockholders agreement, i.e., at 70% of book value payable over 10 years. In support of their motion, respondents submitted an affidavit from Andrew stating that the purpose of the buyout clauses in paragraphs 7 (a) and 10 was to provide for the continuation of the business in the Garda family as long as one of its members was still running it and to provide a mechanism for payment of the buyout without the necessity of selling the business to pay the redemption price. Johnsen did not controvert any of Andrew's statements as to the purpose and intent underlying the buyout provisions.

Supreme Court denied respondents' motion, finding that the August 20, 2003 letter from Johnsen's counsel was not an offer to "donate, hypothecate, pledge, transfer or otherwise dispose

of [Philip's] Stock," as set forth in paragraph 7 (a), and thus did not trigger the right of first refusal accorded to either the corporation or the other shareholders. The court also rejected respondents' argument that a petition for dissolution is equivalent to a voluntary offer to sell. Finally, the court found that since Andrew and Philip failed to provide for the continuation of the business in the event of a proceeding for dissolution, the right-of-first-refusal provision was not triggered by the filing of such a petition. This appeal followed. We reverse.

This case, which, as both parties concede, presents a matter of contract construction, is, in our view, squarely within the holding of *Matter of Doniger v Rye Psychiatric Hosp. Ctr.* (122 AD2d 873 [1986], *lv denied* 68 NY2d 611 [1986]). In *Doniger*, a group of shareholders brought a proceeding seeking the dissolution of a corporation pursuant to Business Corporation Law § 1104 (a) (1) and (3), claiming that because of a deadlock of the board of directors and internal dissension among the shareholders, dissolution would be beneficial. The respondents took the position that the institution of the proceeding for dissolution constituted a proposed "passage or disposition of shares" within the meaning of the shareholders' agreement and that the petitioners were thus required to make an offer of their shares to the other shareholders (122 AD2d at 875). Since the petitioners had not done so, the respondents considered the commencement of the proceeding as an offer by the petitioners to sell their shares.

The *Doniger* court found the shareholders' agreement clear and unambiguous on its face, and that the language that

> "the shares must be offered following 'any proposed passage or disposition of shares whatsoever, *including but not limited to* . . . sale, delivery, assignment, gift, exchange, transfer [or] distribution' (emphasis added), negates any inference that the parties intended to exclude any possible method whereby their ownership interests would be affected, including a proceeding for judicial dissolution" (*id.* at 877).

The Court held that the examples following the words "including but not limited to" were illustrative only, and did "not limit the broad scope of the terms employed" (*id.*). Thus, interpreting the contract language broadly, the Court found that the shareholders must have intended the commencement of a dissolution proceeding as a triggering event for application of the buyout provisions of the shareholders' agreement.

The instant case is no different. In *Doniger*, the parties used the phrase "including but not limited to." Here, the parties chose the expansive language "in any manner whatsover" in defining the circumstances that would trigger a sale of shares under the terms of the stockholders agreement. In both cases, the parties clearly intended to cover the broadest spectrum of events that would trigger the buyout provisions of their agreement.

Neither of the cases relied upon by Johnsen—*Matter of Pace Photographers (Rosen)* (71 NY2d 737 [1988]) and *In re BBS Norwalk One, Inc.* (239 BR 440 [D Conn 1999])—involves stockholder agreements with language similar to that of the agreement in the instant case. Both, decided after *Doniger*, state in dicta that the respective outcomes would be the same as *Doniger* if the language in the shareholders' agreement was equivalent to that in *Doniger* (*see Pace Photographers,* 71 NY2d at 747; *BBS Norwalk,* 239 BR at 443).

The issue in *Pace Photographers,* a proceeding under Business Corporation Law § 1104-a alleging majority oppression and other wrongdoing causing, "in effect, a forced buyout" (71 NY2d at 747), was whether, once the majority shareholders made an irrevocable election under Business Corporation Law § 1118 to purchase the minority shareholders' stock, the shareholders' agreement fixing the price of a voluntary sale of stock to the other stockholders is alone determinative of the "fair value" of the minority interest under the provisions of section 1118. The Court of Appeals never reached the issue of whether a shareholders' agreement fixing value in and of itself precludes relief under section 1104-a, given the majority shareholders' section 1118 election (71 NY2d at 746). Even though the election made it unnecessary to determine if the invocation of section 1104-a necessarily avoids the buyout provisions of the shareholders' agreement fixing value, the Court stated nonetheless (at 745):

> "As we noted in *Matter of Kemp & Beatley (Gardstein)* (64 NY2d 63, 74), it would contravene the remedial purpose of the statute to permit its use by minority shareholders merely as a coercive tool. '[T]he minority shareholder whose own acts, made in bad faith and undertaken with a view toward forcing an involuntary dissolution, give rise to the complained-of oppression should be given no quarter in the statutory protection.' "

As the record demonstrates, Johnsen is using this proceeding to

avoid the stockholders agreement and as a coercive tool to force respondents to pay a higher price for Philip's stock than the agreement provides. There are no allegations of abuse or waste or any wrongdoing by respondents.

*In re BBS Norwalk One, Inc.* (239 BR 440 [1999], *supra*) involved a clause in a shareholders' agreement providing that a shareholder desirous of selling five or more shares to a third party must give written notice to the nonselling shareholders, providing them the opportunity to purchase at the same price and terms as offered to the third party. The United States Bankruptcy Court for the District of Connecticut, applying New York law, found that a liquidating plan in a chapter 11 proceeding did not trigger this particular buyout provision. As already noted, the court also stated that the result would be different if the shareholders' agreement contained language similar to that in *Doniger* (*id.* at 443).

In defense of her position, Johnsen also argues that strict application of the buyout provision deprives her of the right to seek a sale of her father's stock at full market value. But paragraph 7 (b) of the stockholders agreement allows a stockholder to sell his or her stock to a third party. If a bona fide offer is received, the corporation or a remaining stockholder has a right to purchase the stock so offered at the same terms and conditions. That Johnsen did not avail herself of this option is of no moment. What is relevant is that she is attempting to use this proceeding as leverage to coerce respondents to pay a higher price for the stock than is provided for in the stockholders agreement.

As in *Doniger*, we find the language of the stockholders agreement clear and unambiguous. Hence, we have no need to resort to extrinsic evidence. Assuming, arguendo, however, that the buyout provision was not free from ambiguity, Andrew's sworn statements, uncontroverted, as to the purpose and intent underlying the buyout, and specific performance provisions of the stockholders agreement, are deemed admitted (*Kuehne & Nagel v Baiden*, 36 NY2d 539 [1975]). Thus, the only remaining issue is the question whether, in light of the specific intent of the parties as to these provisions, as articulated by Andrew in his affidavit, it is reasonable to conclude, as a matter of law, that the commencement of an involuntary dissolution proceeding is within the contemplation of "otherwise dispos[ing] of his Stock in any manner whatsoever," as provided in the stockholders agreement. We find that it is.

Accordingly, the order of the Supreme Court, New York County (Rosalyn Richter, J.), entered February 4, 2005, denying respondents' motion for summary judgment on their counterclaim "enjoining and requiring petitioner to sell, assign, [or] transfer all of the capital stock of ACP Distribution Inc. owned by Philip J. Garda in accordance with the applicable terms of, and at the price determined under the Stockholders' Agreement," should be reversed, on the law, with costs and disbursements, the motion granted and petitioner Johnsen directed to sell Philip's shares to ACP or the other shareholders if either exercises the right of first refusal in accordance with the applicable terms of, and at the price provided in, the stockholders agreement.

SAXE, J.P., NARDELLI and WILLIAMS, JJ., concur.

Order, Supreme Court, New York County, entered February 4, 2005, reversed, on the law, with costs and disbursements, respondents' motion for summary judgment on their counterclaim "enjoining and requiring petitioner to sell, assign, [or] transfer all of the capital stock of ACP Distribution Inc. owned by Philip J. Garda in accordance with the applicable terms of, and at the price determined under the Stockholders' Agreement," granted and petitioner directed to sell Philip's shares to ACP or the other shareholders if either exercises the right of first refusal in accordance with the applicable terms of, and at the price provided in, the stockholders agreement.